# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION AT DAYTON

Judith A. Hempfling,

            Plaintiff,                      Case No. 3:17-cv-182

v.                                                               Judge Thomas M. Rose

Community Mercy Health Partners,

            Defendant.

___

**ENTRY AND ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (ECF 18) AND GRANTING PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT (ECF 25)**

___

This matter is before the Court on Defendant Community Mercy Health Partners' Motion for Summary Judgment (ECF 18) and Plaintiff Judith A. Hempfling's Cross-Motion for Summary Judgment. (ECF 25) Plaintiff seeks payment of overtime under the Fair Labor Standards Act. Defendant admits to having scheduled and paid Plaintiff for 48 hours every other week, but reasons that because Plaintiff was not constantly occupied for all of those 48 hours, overtime is not due. This is not how overtime works under the FLSA.

## I.    Background

Plaintiff Judith A. Hempfling was employed by Defendant Community Mercy Health Centers. Initially, her job title was "RN Hospice After-Hours On-Call" until March 25, 2015, and then "RN Hospice On-Call" after that date. She was paid $36 per hour. (Sprocket Depo., Exhibit 2, pp. 14-15; Tr., p. 92, ll. 5-16.)

Hempfling's normal Mercy schedule as RN Hospice On-Call was 4:30 p.m. on Wednesday to 8:00 a.m. on Thursday, which amounts to 15 hours, and from 8:00 a.m. Saturday to 8:00 a.m.

Monday, an additional 48 hours, every other weekend. (Tr., pp. 20-21.) Hempfling was paid hour-for- hour at her hourly rate for all 48 hours of her time. (Tr., p. 128, ll. 17-20.) Hempfling recorded her weekly activities on "activity logs" that she submitted to Mercy. (Tr., p. 50, ll. 9-25; p. 51; ll. 1-23; p. 108, ll. 23-24; p. 114, ll. 6-12; p. 128, ll. 21-25; p. 129, ll. 1-15; DX E and F, Exhibits 3 and 4.) She further recorded both her work activities (office time, patient calls, and patient home visits) and her "on call" time on the activity logs. (DX E and F, Exhibits 3 and 4.)

Hempfling focuses on the every-other-weekend 48-hour shift. Hempfling's weekend shift routine was to arrive at the administrative office, where no patients resided, and to review written reports and listen to phone messages from nurses who had worked the prior shift to update herself about the patients. (Tr., pp. 22-24, 32, 34.) She normally would stay in the office until 10:00 or 11:00 a.m. before she went on the road to visit patients (i.e., two to three hours after arriving at 8:00 a.m.). (Tr., p. 25, l. 23; p. 27.) She was not required to spend any minimum amount of time at the administrative office. (Tr., pp. 34, 53.) When notified of a need for patient care while Hempfling was on call during the weekend shifts, Hempfling would visit patients at their homes, document patient issues, take phone calls from doctors, labs, or relatives in regard to patients, and triage which patients needed attention during her shift. (Tr., p. 34, ll. 5-13; p. 35.)

Hempfling communicated with patients using her cellular phone when patients did not text or email her. (Tr., pp. 35-36.) Patients would call her directly. (Tr., p. 35, ll. 21-24.) Phone calls throughout the day would typically take 5 or 10 minutes and Hempfling estimates she would receive over 100 phone calls during the weekend shift. (Tr., p. 69, ll. 5-11; p. 70.) The available Verizon logs of Hempfling's calls establish that for the 23 full 48-hour weekend shifts covered by the Verizon data, Hempfling made 111 calls per weekend, for an average of 3.4 minutes per call, which amounts to 6.3 hours of calls throughout a weekend. (Banner Affidavit, Exhibit 5, with attached Exhibits 6-10.)

Hempfling typically averaged 8 to 10 patient home visits over the weekend that would take 30 to 45 minutes each. (Tr., p. 70, ll. 4-8; p. 71, ll. 2-6.)

Throughout the weekend, Hempfling was to be available. Human Resources Director Bess Sprocket clarified the dual nature of Hempfling's weekend shifts: "They had a schedule to work the weekend and be ready to work, if not at the office, to be on call." (Sprockett Depo., pp. 22-23.) Thus, Hempfling was paid her full hourly rate for on-call time. (Id., p. 72.)

At the beginning of Hempfling's weekend shifts, the night nurse would switch the phone over from the switchboard to Hempfling's cellular phone so that she could remain mobile for the rest of her weekend shift. (Tr., pp. 22-23, 36, 41.) Further, no mileage restrictions existed in regard to where Hempfling could travel during the weekend shift, but typically she would stay within a 12- mile radius from her home. (Tr., pp. 64-65.) She primarily stayed within the Springfield/Urbana, Ohio area. (Tr., p. 72.) And, except for clocking in and out at the beginning and at the end of her weekend shift, Hempfling did not punch in and out when she left the office or patients' homes. (Tr., p. 127, ll. 12-25; p. 128, ll. 1-20; DX E and F, Exhibits 3 and 4.)

When Hempfling was not actually carrying out her job responsibilities during the weekend shifts, she could sleep or otherwise perform personal activities such as grocery shopping, walking, reading, watching television, eating, or talking with friends and family. (Tr., pp. 55-57, 62-64.) She engaged in these personal activities throughout the weekend shifts at her discretion. (Tr., pp. 63-64, 73.)

Hempfling worked alone with patients both during her weekend and weekday shifts. (Tr., p. 42; p. 43, ll. 12-16, p. 44, ll. 19-22; p. 88, ll. 5-11.). If she became busy, she had a backup supervisor and a LPN and crisis care nurse who worked 8:00 a.m. to 8:00 p.m. each day of the weekend to assist her if necessary. (Tr., pp. 28, 41-42.) If Hempfling did not answer her phone call within about 10 minutes, the operator would give the patient the option of calling the backup

supervisor or one of her colleagues. (Tr., pp. 67-68.) Hempfling otherwise had complete discretion to triage the importance of any call. (Tr., pp. 59-61.) She also had the flexibility of following up on patient calls within one hour. (Tr., p. 58.) She did not have to monitor a radio for calls and was not required to leave a number where she could be reached if she had to go out of the area. (Tr., pp. 71-72.)

When Hempfling was not in the office or visiting patients, she was either working at home doing all of the other elements of her job such as telephone calls and paperwork, or she was engaging in personal activities. (Tr., p. 52; p. 53, ll. 1-9; pp. 55-58.) No work rule existed prohibiting her from engaging in personal endeavors during her weekend shift. (Tr., p. 57, ll. 2-5.) The amount of calls she would make and receive and the paperwork she filled out varied with the demands of the patients on a given day. (Tr., p. 52.) She had discretion within her shift to determine how much and what she did. (Tr., pp. 55, 60, 73.) She spent at least 8 hours a day at home. (Tr., p. 61.) Most of the time, she had at least a 20-minute uninterrupted lunch break and could take intermittent breaks during the day. (Tr., p. 74, ll. 11-15; p. 76, ll. 4-13.) And if it was not busy during the night, Hempfling could sleep until morning. (Tr., p. 45, ll. 15-18; p. 55, ll. 1-10.)

Hempfling recorded her weekend shift activities on the activity logs she submitted to Mercy. (Tr., p. 50, ll. 9-25; p. 51; ll. 1-23; p. 108, ll. 23-24; p. 114, ll. 6-12; p. 128, ll. 21-25; p. 129, ll. 1-15; DX E and F, Exhibits 3 and 4.) She recorded her work activities (office time, patient calls, and patient home visits) on the activity logs, and the rest of the time was recorded by her, in her own writing, as "on call" time. (Tr., p. 110, ll. 3-12; DX E and F, Exhibits 3 and 4.) She documented "paperwork" 176 times, "calls" 142 times, and "orientation" 9 times during the claim period, in addition to logging patient visits by name. (Banner Depo., Exhibit 14, PX 1, Exhibit 15.)

If one were to subtract out the on-call time that Hempfling recorded on her activity logs,

the time during the alternative weeks she was on a weekend shift added up to 25.4 hours per week on average. (Banner Depo., Exhibit 14, pp. 10-11; PX 2, 3 and 4; Exhibits 16, 17 and 18.)

Hempfling's job was outsourced to Dayton Hospice in October of 2016. On March 24, 2017, Plaintiff filed this claim seeking liquidated damages, attorney's fees, and an extra year of overtime pay for willfully failing to pay overtime. (ECF 1) Defendant Mercy Health Partners filed a Motion for Summary Judgment. (ECF 18) Plaintiff Judith A. Hempfling filed a Cross Motion for Summary Judgment. (ECF 25)

## II.   STANDARD OF REVIEW

The standard of review applicable to motions for summary judgment is established by Federal Rule of Civil Procedure 56 and associated case law. Rule 56 provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. at 56(c). Alternatively, summary judgment is denied "[i]f there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Hancock v. Dodson*, 958 F.2d 1367, 1374 (6th Cir. 1992) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986)). Thus, summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The party seeking summary judgment has the initial burden of informing the court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, admissions and affidavits which it believes demonstrate the absence of a genuine issue of material fact. *Id.*, at 323. The burden then shifts to the nonmoving party who "must set

forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S., at 250 (quoting Fed. R. Civ. at 56(e)).

Once the burden of production has shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is not sufficient to "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rule 56 "requires the nonmoving party to go beyond the pleadings" and present some type of evidentiary material in support of its position. *Celotex Corp.*, 477 U.S., at 324.

In determining whether a genuine issue of material fact exists, a court must assume as true the evidence of the nonmoving party and draw all reasonable inferences in the favor of that party. *Anderson*, 477 U.S., at 255. If the parties present conflicting evidence, a court may not decide which evidence to believe by determining which parties' affiants are more credible. 10A Wright & Miller, *Federal Practice and Procedure*, § 2726. Rather, credibility determinations must be left to the fact-finder. *Id.*

Finally, in ruling on a motion for summary judgment, "[a] district court is not…obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989). Thus, in determining whether a genuine issue of material fact exists on a particular issue, the court is entitled to rely upon the Rule 56 evidence specifically called to its attention by the parties.

## III. ANALYSIS

Defendant is accused of violating the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, *et seq*. The statutory definition section of the FLSA is notable for how broadly it defines "employee":

> As used in this chapter–

> (e)(1) Except as provided in paragraphs (2)[public office holders and their appointees], (3)[immediate family of farmers], and (4)[individuals who volunteer with the government], the term "employee" means any individual employed by an employer.
>
> * * *
>
> (g) "Employ" includes to suffer or permit to work.

29 U.S.C. § 203.

Thus, the FLSA defines "employee" in "exceedingly broad" terms, see *Tony & Susan Alamo Found. v. Secretary of Labor*, 471 U.S. 290, 295 (1985). The Supreme Court has noted that there are limitations to the Act's breadth, giving as an example "[a]n individual who, 'without promise or expectation of compensation, but solely for his personal purpose or pleasure, worked in activities carried on by other persons either for their pleasure or profit,' is outside the sweep of the Act." *Id.* (citing *Walling v. Portland Terminal Co.*, 330 U.S. 148, 152 (1947)). Thus, "[t]he test for employment under the Act is one of economic reality," *Id.* at 301, whether the persons in question undertook the covered activities "in expectation of compensation." *Id.* at 302; see also *Shaliehsabou v. Hebrew Home of Greater Washington, Inc.*, 369 F.3d 797, 798-99 (4th Cir. 2004) (Luttig, J., dissenting).

"Th[e] Act contains...definitions, comprehensive enough to require its application to many persons and working relationships, which prior to this Act, were not deemed to fall within an employer-employee category." *Walling v. Portland Terminal Co.*, 330 U.S. 148, 150 (1947). Obviously, the "'to suffer or permit to work,' ... language of the FLSA,...require[s] much less positive action than under the common law." *Frees v. UA Local 32 Plumbers and Steamfitters*, 589 F. Supp. 2d 1221, 1229 (W.D. Wash. 2008) (citing 29 C.F.R. § 825.105(a)). "Mere knowledge by an employer of work done for the employer by another is sufficient to create the employment

relationship under the Act." *Id.* (See also Department of Labor Field Operations Handbook § 10b01).

The Supreme Court has recognized that the principal congressional purpose in enacting the FLSA was to protect all covered workers from substandard wages and oppressive working hours, "labor conditions [that are] detrimental to the maintenance of the minimum standard of living necessary for health, efficiency and general well-being of workers." *Barrentine v. Arkansas-Best Freight System, Inc.*, 450 U.S. 728, 738-39 (1981) (quoting 29 U.S.C. § 202(a)). The FLSA was designed to give specific minimum protections to individual workers and to ensure that each employee covered by the Act would receive "'[a] fair day's pay for a fair day's work'" and would be protected from "the evil of 'overwork' as well as 'underpay.'" *Id.*; see also *Overnight Motor Transportation Co. v. Missel*, 316 U.S. 572, 578 (1942) (quoting 81 Cong. Rec. 4983 (1937) (message of President Roosevelt)).

The FLSA requires employers to pay covered employees overtime compensation "at a rate not less than one and one-half times the regular rate" for every hour worked in excess of forty hours per week. 29 U.S.C. § 207(a)(1). Thus, to establish a violation of this provision, an employee must prove: (1) that he worked more than forty hours in a particular work week; and (2) that he was not paid at least one and a half times his regular pay rate for the hours worked in excess of forty. *Baden-Winterwood v. Life Time Fitness, Inc.*, 566 F.3d 618, 626 (6th Cir. 2009).

The system for proving time worked in excess of forty hours is governed by a burden-shifting paradigm established by the Supreme court in *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680 (1946).

> "An employee who brings suit under § 16(b) of the Act for unpaid minimum wages or unpaid overtime compensation, together with liquidated damages, has the burden of proving that he performed work for which he was not properly compensated. The remedial nature of this statute and the great public policy which it embodies, however, militate against making that burden an impossible hurdle for the employee."

*Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 686-87 (1946).

"Due regard must be given to the fact that it is the employer who has the duty under § 11(c) of the Act to keep proper records of wages, hours and other conditions and practices of employment and who is in position to know and to produce the most probative facts concerning the nature and amount of work performed." *Anderson*, at 687; see also 29 U.S.C. § 211(c) and 29 C.F.R. § 516.2(a)(7). "When the employer has kept proper and accurate records the employee may easily discharge his burden by securing the production of those records." *Anderson*, at 687.

When an employer has failed to keep accurate or adequate time records, an employee may satisfy her burden to show that she performed off-the-clock work if she produces evidence to generally show the amount and extent of the uncompensated work "as a matter of just and reasonable inference." *Anderson,* at 687. This lesser burden may be satisfied by the sole testimony of the complaining employee based on her recollection alone. *Id.* at 170.

Should the employee satisfy this reduced standard to make her *prima facie* case, then under *Anderson,* the burden shifts to the employer to produce evidence to negate the reasonableness of the inference drawn from the evidence provided by the plaintiff employee. *Id.* Should the defendant employer fail to produce evidence to rebut the employee's *prima facie* case, the court may award the plaintiff employee damages even if such

damages must be approximated. England v. Advance Stores Co. Inc., 263 F.R.D. 423, 448 (W.D. Ky. 2009) (citing *Harvill v. Westward Communications, LLC,* 433 F.3d 428, 440-41 (5th Cir. 2005) (discussing the burden shifting approach of *Anderson); Grochowski v. Phoenix Construction,* 318 F.3d 80, 87–88 (2nd Cir.2003) (same); and *Felker v. Southwestern Emergency Medical Service, Inc.,* 581 F. Supp.2d 1006, 1009-10 (S.D.Ind.2008)).

As Defendant informs the Court, "There are no incomplete time records here – Hempfling clocked in at 8:00 am on Saturdays and clocked out at 8:00 am on Mondays (Tr., p. 127), and so her 48-hour weekend time schedule is documented and undisputed." ECF 28, PageID 1721 (see also PageID 1714). Thus, Hempfling was compensated. Her employer's records show the hours she worked, and that she was paid straight time.

There, the Court's analysis is largely at an end. To the extent Plaintiff worked more than 40 hours in a week, she is entitled to overtime pay. Because this information comes from the employer's own records, the employer had knowledge of this, and the failure was willful.

Defendant would have the Court consider whether Plaintiff was actively engaged in labor the entire time she was scheduled by her employer—as if maybe Defendant should not have paid her in the first place. The Court notes the absence of a cross-claim for unjust enrichment.

The cases and regulations Defendant cites to support their position all relate to cases examining whether hours were compensable at all. See, e.g., *Abdelkhaleq v. Precision Door of Akron*, 653 F. Supp. 2d 773, 779 (N.D. Ohio 2009) ("[W]hether…time spent on-call constitutes working time depends on all the circumstances of the case.") (Plaintiff was not compensated for hours worked, unlike here); *Rutlin v. Prime Succession, Inc*., 220 F.3d 737, 744 (6th Cir. 2000)

(determining if Plaintiff was entitled to compensation, not overtime, unlike here); *Oldham v. U.S. Postal Service*, 465 Fed. Appx. 440, 444 (6th Cir. 2012) (denying compensation to a postal employee for hours spent at facility before scheduled shift and after end of shift at his own volition).

The Court finds as a matter of law, that even if this were the standard by which this case were to be adjudicated, Plaintiff would still prevail. An employee must be compensated for on-call time spent "predominantly for the employer's benefit." *Rutlin v. Prime Succession, Inc.*, 220 F.3d 737, 743 (6th Cir. 2000), citing *Aiken v. City of Memphis*, 190 F.3d 753 (6th Cir. 1999); see also *Martin v. Ohio Turnpike Comm'n*, 968 F.2d 606, 611 (6th Cir. 1992). The Department of Labor regulation titled "On-call time" states: "An employee who is required to remain on call on the employer's premises or so close thereto that he cannot use the time effectively for his own purposes is working while 'on call.'" 29 C.F.R. § 785.17. More specifically:

> Time spent at home on call may or may not be compensable depending on whether the restrictions placed on the employee preclude using the time for personal pursuits. Where, for example, a firefighter has returned home after the shift, with the understanding that he or she is expected to return to work in the event of an emergency in the night, such time spent at home is normally not compensable. On the other hand, where the conditions placed on the employee's activities are so restrictive that the employee cannot use the time effectively for personal pursuits, such time spent on call is compensable.

29 C.F.R. § 553.221(d); see *O'Neill v. Mermaid Touring Inc.*, 968 F. Supp. 2d 572, 583 (S.D.N.Y. 2013) (applying 29 C.F.R. § 553.221 to a personal assistant); see also *Bulter v. Ciena Health Care Mgt., Inc.*, No. 16-14071, 2017 WL 6610692, at *1 (E.D. Mich. Dec. 27, 2017) (applying 29 C.F.R. § 553.221 to a nursing & rehabilitation center's Director of Admissions and

Marketing). *Bilskey v. Bluff City Ice, Inc.*, No. 1:13-CV-62 SNLJ, 2015 WL 417976, at *2 (E.D. Mo. Jan. 30, 2015) (applying regulation to ice delivery drivers). Here, Defendant admits that Plaintiff's "actual work time during the alternative weeks she was on a weekend shift added up to 25.4 hours per week on average." (ECF 28, PageID 1725-26). When an employee is actively engaged for 25.4 random hours out of a 48-hour shift, as a matter of law, the employee cannot use the time effectively for personal pursuits.

> Another Department of Labor interpretive regulation discusses waiting time:
>
>> Whether waiting time is time worked under the Act depends upon particular circumstances. The determination involves "scrutiny and construction of the agreements between particular parties, appraisal of their practical construction of the working agreement by conduct, consideration of the nature of the service, and its relation to the waiting time, and all of the circumstances. Facts may show that the employee was engaged to wait or they may show that he waited to be engaged." (*Skidmore v. Swift*, 323 U.S. 134 (1944)) Such questions "must be determined in accordance with common sense and the general concept of work or employment." (*Central Mo. Tel. Co. v. Conwell*, 170 F. 2d 641 (8th Cir. 1948)).

29 C.F.R. § 785.14. Here, Plaintiff was not "wait[ing] to be engaged"—she was paid a flat rate by her employer, who simply wishes to claim such work is exempt from overtime.

Plaintiff was not on call for her own benefit, to take advantage of available work, nor was she waiting to be engaged, to be called in for work on an emergency basis. To the contrary, one of the core functions of her job position was to be available at a moment's notice to take phone calls, give advice, contact patients and providers and visits patients, at any hour – the very definition of being engaged to wait. Therefore, under the applicable regulations and case law, all of her time must be considered to be compensable.

Indeed:

> "an employer, if he chooses, may hire a man to do nothing, or to do nothing but wait for something to happen. Refraining from other activity often is a factor of instant readiness to serve, and idleness plays a part in all employments in a stand-by capacity. Readiness to serve may be hired, quite as much as service itself, and time spent lying in wait for threats to the safety of the employer's property may be treated by the parties as a benefit to the employer." (*Armour & Co. v. Wantock*, 323 U.S. 126 (1944); *Skidmore v. Swift*, 323 U.S. 134 (1944)).

29 C.F.R. § 785.7.

Notably, Defendant rejects the possibility that Plaintiff falls under an exemption from the statute: "there is no viable evidence Mercy treated Hempfling as exempt." ECF 28, PageID 1728.

In light of these findings, arguments that Plaintiff did not keep proper track of how she spent her time while in Defendant's employ are moot.

Where an employer's violation of the FLSA's wage or overtime provisions is "willful," it is subject to a three-year rather than a two-year limitations period. 29 U.S.C. § 255(a). Thus, a willfulness finding would start the Plaintiff's claim period on March 20, 2014. An employer's violation of the FLSA will be held to be willful if it either knew its conduct violated the FLSA or showed reckless disregard about the matter. *Dole v. Elliott Travel & Tours, Inc*., 942 F.2d 962, 967 (6th Cir. 1991) (citing *McLaughlin v. Richland Shoe Co*., 486 U.S. 128, 133 (1988)). Furthermore, as this Court has noted – in a case involving the misclassification of health care workers as exempt – willfulness often is found "in situations in which the employer deliberately chose to avoid researching the laws' terms or affirmatively evading them." *Cook v. Carestar, Inc*., No. 2:11-CV-00691, 2013 WL 5477148, at *13 (S.D. Ohio Sept. 16, 2013) (Marbly, J.) (quoting

*Hoffman v. Professional Med Team*, 394 F.3d 414, 419–20 (6th Cir. 2005)).

Defendant scheduled and paid the Hospice After Hours On Call nurses, treating them as exempt until July 2016, even though there was no legal basis for that conclusion. The Defendant's documents and testimony indicate the employer labeled Hempfling as "exempt" and did not pay overtime although other nurses in very similar job positions, including the case managers, did receive overtime pay. Eventually, when the employer updated its computerized payroll system in the spring of 2016 it determined they should not be treated as exempt and should get overtime pay, although nothing about their job duties had changed. Defendant's Director of Human Resources and the Defendant's designated 30(b)(6) representative to discuss pay issues, could not explain the prior determination or why it was changed. (Sprockett Depo. at 12-14, 38-39, 41-49 & Exs. 2, 6 & 7; see also Mock Depo. at 47-51 & Exs. 16 thereto; Ex. 3 to Hempfling Aff).

"[A]n employer's recordkeeping practices may . . . corroborate an employee's claims that the employer acted willfully in failing to compensate for overtime." *Elwell v. Univ. Hosps. Home Care Servs.*, 276 F.3d 832, 844 (6th Cir. 2002). That Defendant paid Plaintiff for 48-hour work weeks supports a finding of willfulness.

## IV. CONCLUSION

Because Defendant scheduled and paid Plaintiff for 48 hour work weeks every other week and because Plaintiff is not an exempt employee, Defendant's Motion for Summary Judgment (ECF 18) is **DENIED**. For the same reason, Plaintiff's Cross Motion for Summary Judgment (ECF 25) is **GRANTED**. The Court will enter judgment against Defendant, Community Mercy Health Partners, for all unpaid overtime compensation due to the Plaintiff, Judith A. Hempfling,

as a result of Defendant's willful violation of 29 U.S.C. § 207(a), plus an additional equal amount as liquidated damages, pursuant to 29 U.S.C. § 216(b); the Court will further award Plaintiff the costs of this action and her reasonable attorney's fees, pursuant to 29 U.S.C. § 216(b). Plaintiff is to submit a proposed judgment entry, with supporting affidavits, within 30 days. Defendant will be granted twenty days to raise any objections to Plaintiff's calculations.

**DONE** and **ORDERED** in Dayton, Ohio, this Monday, October 29, 2018.

> s/Thomas M. Rose
> _____
> THOMAS M. ROSE
> UNITED STATES DISTRICT JUDGE